**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| CINTRON BEVERAGE GROUP, LLC, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 07-3043 |
| | : | |
| ROCCO DEPERSIA, | : | |
| | : | |
| Defendant/ Third Party Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| A. WESLEY WYATT | : | |
| | : | |
| Third Party Defendant. | : | |

_____:

**MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**                                          **APRIL 1, 2009**

Presently before the Court is a Motion for Summary Judgment filed jointly by Plaintiff,

Cintron Beverage Group, LLC ("Cintron"), and Third Party Defendant, A. Wesley Wyatt

("Wyatt") (collectively, the "Moving Parties"), against Defendant/Third Party Plaintiff, Rocco

DePersia ("DePersia").  For the reasons set forth below, the Motion will be denied.

**I.      BACKGROUND**

Cintron is a limited liability company that produces and distributes various beverages,

one of which is an energy drink by the name of "Cintron."  On July 25, 2007, Cintron filed a

Complaint in this Court seeking a declaration that DePersia has no ownership interest in Cintron,

and is entitled to no compensation or ownership in the company.  On September 13, 2007,

DePersia filed a Motion to Dismiss Cintron's Complaint for failure to join Wyatt as a necessary

party.  This Court denied the Motion to Dismiss by Order dated October 2, 2007.

On October 30, 2007, DePersia filed a Third Party Complaint against Wyatt, asserting claims for breach of contract, quantum meruit, and unjust enrichment.  In his Complaint, DePersia alleges that a contract existed between him and Wyatt, whereby the parties jointly agreed to manufacture and distribute the energy drink, Cintron.  DePersia asserts that Wyatt agreed to share an ownership interest in the company, as well as profits from the sale of the energy drink with DePersia, in exchange for the use of DePersia's band's name and image and DePersia's efforts in marketing the business.

On January 4, 2008, the Moving Parties both filed Motions to Strike the Third Party Complaint and Motions to impose sanctions upon DePersia and his attorneys.  The Motions also asked this Court to issue an injunction enjoining DePersia from filing any further actions against them without leave of court.  By Order dated April 14, 2008, we denied the Motion to Strike the Third Party Complaint, as well as the Motions for sanctions and for injunctive relief.  The Moving Parties currently seek summary judgment with respect to Cintron's Complaint against DePersia and DePersia's Third Party Complaint against Wyatt.[1]

This matter stems from a series of business dealings between DePersia and Wyatt. DePersia is an attorney licensed to practice in the State of New Jersey.  Since 2000, he has also been the co-leader and lead singer in a local Latin band named Cintron (the "Band"), along with

---

[1]DePersia asserts that the Moving Parties seek summary judgment on all his causes of action, but have not challenged Count II (Quantum Meruit) and Count III (Unjust Enrichment) in their Motion.  Consequently, DePersia argues that this Motion should be treated as a Motion for Partial Summary Judgment.  A review of the Motion reflects that the Moving Parties have not challenged these claims, and thus, we shall address it as a Motion for Partial Summary Judgment.

its co-leader, Edgardo Cintron.  DePersia also owns a corporation called Shark Salsa Latin Productions, Inc. ("Shark Salsa"), which acts as the music production company for the Band, and books the Band's business.  DePersia and Wyatt first began a business relationship in 2004 when DePersia sought an investor to finance the recording and promotion of a Latin jazz CD by his Band.  Wyatt invested in the Band and financed the completion and promotion of a CD called "Back in the Day."  In exchange for his investment, DePersia agreed to share equally with Wyatt all revenues generated by sales of the CD.  This deal was never reduced to writing.

Shortly thereafter, Wyatt expressed an interest in re-branding his off-shore racing boat that was being sponsored by his company, D.F. Young, Inc.  DePersia and Wyatt agreed that cross-marketing between the Band and the racing venture would be beneficial to both, so they reached an oral agreement whereby DePersia permitted Wyatt to re-brand his racing boat with the name and image of the Cintron Band.  DePersia asserts that in December 2004, while attending a social dinner, DePersia and Wyatt discussed the idea of creating a consumer product that they could cross-market with the Band and the racing team.  Wyatt suggested the idea of an energy drink, and they agreed to pursue all three ventures.  DePersia contends that he and Wyatt orally agreed that Wyatt would invest the funds necessary for the development of the energy drink, while DePersia agreed to contribute the name and image of the Band, as well as, his marketing concepts, design concepts, and leg work to get the energy drink side of the business established.  According to DePersia, both parties agreed to share in the ownership and profits from the energy drink venture.  He states that in May 2005, Wyatt asked him to draft a written agreement to encompass the oral agreements reached with respect to the Cintron Band, the off-shore racing boat venture, and the development of the energy drink.  DePersia drafted an agreement, but

Wyatt did not sign it.  (Pls.' Mot. Summ. J., Ex. E).  The agreement stated, in part:

> [A]ny income generated by the CINTRON CD, the theme song CD and/or the
> energy drink shall be allocated between the parties pursuant to a mutually
> accepted agreement to be entered into between the parties within 30 days of the
> release of the aforesaid CINTRON CD or the production of the first 50 cases of
> the aforesaid energy drink. . . .

Id.

In May or June 2005, Wyatt asked DePersia to approach Edgardo Cintron and acquire

rights to the use of the Cintron name in connection with the energy drink, so that they could use

the name freely without any objection from Edgardo Cintron.  DePersia testified in his deposition

that he suggested five percent (5%) of the profits a year up to a cap of $50,000, and Wyatt

responded that this sounded fair to him.  DePersia stated further that he drew up the document

and that he and Wyatt agreed that the contract would be between Edgardo Cintron and Shark

Salsa because Cintron did not exist at that point.  They further agreed that once Cintron got up

and going, it would assume the obligation to Edgardo Cintron.  (DePersia Dep. 72:16- 73:16.)

DePersia testified that beginning in December 2005, until approximately January 2006,

he was actively making efforts to develop an energy drink.  He researched the market, and met

with potential manufacturers and distributors. (Id. at 134:20- 136:9.)  In January 2006, DePersia

stated that he and Wyatt became discouraged with the progress of the development of the drink,

so they decided to secure someone with experience in the beverage industry.  DePersia met with

Joseph Roberts ("Roberts"), the current Chief Operating Officer of Cintron.  At that time,

Roberts was working for another beverage company, but expressed interest in other

opportunities.  DePersia arranged a meeting with Wyatt and Roberts.  On April 22, 2006, Wyatt

sent DePersia and Roberts an email agreeing to include Roberts in the company and to give him a

4

ten percent (10%) share in the business, and ultimately in May 2006, Roberts agreed to join the team.  Thereafter, Cintron was formed on May 16, 2006.

On July 6, 2006, DePersia sent a draft agreement to counsel for Cintron.  This agreement contemplated the assignment of the name "Cintron" without any restrictions.  It also proposed that DePersia would receive a 10% interest in Cintron, and that Cintron would assume Shark Salsa's obligation to pay Edgardo Cintron.  (Pls.' Mot. Summ. J., Ex. I.)  Wyatt then sent his own draft, titled "Trademark Assignment Agreement," to DePersia on July 12, 2006.  This agreement was to be made among Shark Salsa, Edgardo Cintron, and Cintron and proposed a transfer of all rights to the name "Cintron" from Shark Salsa and/or Eduardo Cintron to Cintron, and also contemplated that once Wyatt's investment in the costs for the production, promotion, and sale of the energy drink through the date of the agreement were recovered, Cintron would provide 20 % of its issued and outstanding membership interests to Shark Salsa.  The draft agreement also provided that once costs were recovered by Cintron, Cintron would pay 5% of its profits, up to a cap of $50,000 to Edgardo Cintron.  (Pls.' Mot. Summ. J., Ex. J.)

On July 17, 2006, DePersia responded to Wyatt's draft Trademark Assignment Agreement, and requested that the agreement be amended to state that DePersia owns 20% of Cintron, but would not be able to take a profit until Wyatt recovered his investment.  DePersia also requested that the agreement reflect that the "mark cannot be sold, transferred and/or assigned, in whole or part, without written consent of Shark Salsa Latin Productions, Inc. . . . " (Pls.' Mot. Summ. J., Ex. K.)  On this same day, Wyatt's attorney wrote DePersia and stated that an assignment would not be needed, as he had "completed [his] research with respect to the mark 'Cintron' and there [were] no other individuals or entities using the mark in connection with

beverages." (Def.'s Resp. Mot. Summ. J., Ex. M.)

On January 15, 2007, DePersia sent Wyatt an updated agreement regarding ownership of

Cintron.  In such, he wrote:

> [I]t is hereby reaffirmed and restated that ROCCO A. DePERSIA shall have
> ownership of 10% of the CINTRON BEVERAGE GROUP, LLC and that any and
> all documents, papers, forms and authorizations shall be executed and all other
> actions taken that may be necessary to complete and vest said ownership in
> ROCCO A. DePERSIA immediately upon execution of this Agreement.

(Def.'s Resp. Mot. Summ. J., Ex. L.)

Wyatt points out that this agreement was with Cintron, DePersia and Shark Salsa, and

that Wyatt was not a party to the alleged agreement.  He further asserts that the parties never

signed an agreement as to any of the terms outlined above, including ownership interest in

Cintron, and accordingly, all of the above-referenced documents were merely negotiations

between the parties.  Wyatt testified that Cintron is entirely financed by him, and that, to date, he

had invested twenty million dollars into the business.  Wyatt further testified that, to date,

Cintron has not made any profit, and he has not recovered any of his investment.  (Wyatt, Dep.

229:15- 232:2.)

## II.  <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is

no genuine issue as to any material fact and the moving party is entitled to judgment as a matter

of law.  <u>See</u> <u>Hines v. Consol. Rail Corp.</u>, 926 F.2d 262, 267 (3d Cir. 1991).  The Court asks

"whether the evidence presents a sufficient disagreement to require submission to the jury or

whether . . . one party must prevail as a matter of law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 251-52 (1986).  The moving party has the initial burden of informing the court of the

basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "A fact is material if it could affect the outcome of the suit after applying the substantive law.  Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'"  Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992).  "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion.  Tziatzios v. U.S., 164 F.R.D. 410, 411-12 (E.D. Pa. 1996).  If the court determines that there is no genuine issues of material fact, then summary judgment will be granted.  Celotex, 477 U.S. at 322.

III.   **DISCUSSION**

**A.  Ownership of Cintron**

As stated above, Wyatt argues that a contract never existed between himself and DePersia wherein he agreed that DePersia would share in the ownership of Cintron.  An enforceable contract requires an offer, acceptance, consideration and mutual meeting of the minds.  Schreiber

v. Olan Mills, 627 A.2d 806, 808 (Pa. Super. Ct. 1993).   The offer and the acceptance must

include the essential terms that both parties intend to be binding.  Cosme v. Durham, No. 07-

3153, 2008 WL 324020, at *3 (E.D. Pa. Feb. 4, 2008) (citing In re Estate of Hall, 731 A.2d 617,

621 (Pa. Super. Ct.1999)). The essential terms must be definite enough to provide a basis for

enforcing the agreement.  Cosme, 2008 WL 324020, at *3, (citing Biddle v. Johnsonbaugh, 450,

664 A.2d 159, 163 (Pa. Super. Ct. 1995)). In short, the "test for enforceability of an agreement is

whether both parties have manifested an intention to be bound by its terms and whether the terms

are sufficiently definite to be specifically enforced."  Channel Home Ctrs v. Grossman, 795 F.2d

291, 298-99 (3d Cir.1986).  Further, "'it is hornbook law that evidence of preliminary

negotiations or an agreement to enter into a binding contract in the future does not alone

constitute a contract.'" Id.; see also Middleton v. Realen Homes, 24 F. Supp. 2d 430, 435-36

(E.D. Pa. 1998). In other words, before preliminary negotiations ripen into contractual

obligations, there must be manifested mutual assent to the terms of a bargain.  McCloskey v.

Novastar Mortg., Inc., No. 05-1162, 2007 WL 2407103, at *5 (E.D. Pa. Aug. 21, 2007).

　　　　Wyatt asserts that the parties went through a number of preliminary negotiations whereby

they exchanged proposed terms in a number of writings, but that they never reached a meeting of

the minds as to establish an enforceable contract with regard to several issues, including

ownership of Cintron.  As outlined in detail above, there is no question that there were a number

of preliminary negotiations between Wyatt and DePersia.  This is evidenced by the numerous

written proposals sent back and forth between them.  There is also no question that none of these

documents was signed by the parties.  Thus, the issue before us is whether the parties came to an

enforceable oral contract regarding ownership of Cintron.  It is established law in Pennsylvania

that if parties agree upon essential terms and intend them to be binding, "a contract is formed

even though they intend to adopt a formal document with additional terms at a later date."

Johnston v. Johnston, 499 A.2d 1074, 1076 (Pa. Super. Ct. 1985); Courier Times, Inc. v. United

Feature Syndicate, Inc., 445 A.2d 1288, 1295 (Pa. Super. Ct. 1982).

Here, there is significant evidence in this record that, although there was no final

agreement(s) in writing, an oral agreement existed between Wyatt and DePersia, and that such

agreement may establish that DePersia had an ownership interest in Cintron.  Whether the

agreement established ownership, and the exact percentage of that ownership, are questions for

the factfinder, as the intent of the parties is a question of fact which must be determined by the

factfinder.  Yellow Run Coal Co. v. Alma-Elly-Yv Mines, Ltd., 426 A.2d 1152, 1154 (Pa. Super.

Ct. 1981); Luria v. Robbins, 302 A.2d 361, 363 (Pa. Super. Ct. 1973).

DePersia testified at his deposition that near the end of May 2005, at a restaurant in

Philadelphia, he and Wyatt officially agreed how the interests in Cintron were to be divided.

DePersia stated:

> He [Wyatt] said let's – here's how we are going to split it [ownership of Cintron].
> We're going to give - - he said to me, you and I are going to split it equally.  And
> now, what should we do about Joe Mangold and Ronny Kyle, because they had
> been very – both of these guys had been helpful in getting us going.  And then, he
> and I agreed that we would give them each 10 percent.  So it was - - excuse me - -
> he takes his costs off the top.  Then we give Joe Mangold 10 percent, we give
> Ronny Kyle 10 percent, and then he and I split the rest equally.  And that was
> communicated to Joe Mangold right in my presence.

(DePersia Dep. 10:17-112:12.)

DePersia added that this was not a proposal between him and Wyatt, but an agreement.

"We shook on it.  We toasted to it.  We embraced each other, like we're going to do this, we're

9

going to do that, type of thing.  And we reaffirmed it on several occasions." (DePersia Dep. 115:

21- 116: 4.)  DePersia further testified that the agreement was later modified.

> After we got Mr. Roberts involved and the company was incorporated, at some
> point in that spring, late spring, summer, Wes and I had a conversation about how
> we were going to split the company.  And I said to him that what I thought would
> be fair under this new company, we'll amend our agreement and I'll take 20
> percent rather than half.  And that's how it happened.

(DePersia Dep.159: 16-24.)

DePersia also submitted affidavits which support his assertion that an oral agreement with

Wyatt concerning his ownership in Cintron had been made.  Richard DePersia, Rocco DePersia's

brother, stated in an affidavit that sometime in 2004, Wyatt became an investor in the Band's

making of a CD, and that near the end of 2004, DePersia and Wyatt agreed to begin a beverage

business together.  He stated that he was in their company many times over the next couple of

years and that, "[a]t all times, when Rocco and Wes were together, they talked about the

beverage business as their joint endeavor and held themselves out as partners in this venture."

Richard DePersia further stated that while playing golf with Wyatt in the fall of 2006, Wyatt told

him that DePersia had a 20% ownership interest in Cintron.  (Richard DePersia Aff., at 2-3.)

Joseph Mangold stated in an affidavit that he had known Wyatt from prior business

dealings, and had introduced him to DePersia.  He stated that Wyatt and DePersia immediately

became friends and worked on the Band's CD together.  After the Band's CD was completed,

Wyatt put the Cintron Band name on his off-shore racing boat, and thought the Band was a great

promotional tool for his boat.  Mangold added that at some point, Wyatt and DePersia advised

him of their idea to launch an energy drink, and explained that they thought it was a great cross-

promotional tool for the Band and the racing boat.  Mangold stated that he attended numerous

meetings with Wyatt and DePersia regarding the energy drink, and that at all times, Wyatt and DePersia referred to each other as partners in the energy drink endeavor.  Mangold also stated that he has had conversations directly with Wyatt about DePersia's interest in Cintron, and that during one of those conversations, Wyatt advised him that DePersia owned a 20% share in Cintron.  (Mangold, Aff., 1-2.)

Furthermore, Wyatt's own deposition testimony indicates that he had oral agreements with DePersia regarding ownership of Cintron, although the exact percentage was modified several times.  At one point during their dealings, as noted above, DePersia's interest in Cintron was to be an equal share with Wyatt after Wyatt's initial investment came off the top and Ronny Kyle and Joe Mangold got their 10% shares.  Later, the percentage interest may have changed from 20% down to 10%, but nonetheless, Wyatt's testimony indicates that he orally agreed that DePersia did have an ownership interest in Cintron.   Wyatt testified:

> Q:     Did Rocco agree to you verbally to the 10 percent deal?
> A:     He said to me as I was leaving something to the effect are we going to get this done?  I said it sounds good to me, I will call Jeff and have him paper it up.
> Q:     So the purpose of having Jeff paper it up as you say is to put in writing what you guys had discussed at lunch?
> A:     Correct.
> Q:     To memorialize the deal in writing, right?
> A:     Yes.

(Wyatt Dep. 141:2-15.)

Wyatt twice more acknowledged this oral agreement:

> Q:     It was only three weeks before that you had met with [DePersia] and come to terms on the 10 percent deal, right?
> A:     Right.  As I said, I had a conversation with counsel, and that is when I determined that I wouldn't be signing the deal.

(Id. at 198:15-21.)

. . . .

Q:    When you say you didn't agree is that because you didn't sign any agreement that
        has these numbers in it?
A:    That is because I didn't agree to it.
Q:    You didn't agree to it verbally with him?
A:    No.
Q:    Never shook hands with him over that deal?
A:    I shook hands with him as I stated on a 10 percent deal, not a non dilution deal.

(Id. at 173: 1-12.)

Further supporting DePersia's contention that he and Wyatt came to a verbal agreement

regarding ownership of Cintron, is the evidence in the record that the parties had a history of oral

agreements between them that they relied upon in doing business together.  DePersia testified at

his deposition that he and Wyatt had a "history of doing things on a handshake and having

conversations and being able to rely on them." (DePersia Dep. 108: 17-19.)  Furthermore, Wyatt

testified:

Q:    By investing in the band what was your goal?
A:    Well, to help Rocco complete the CDs, the unfinished CD, and have the
        band to market or cross market the race team or have the band be part of
        the race team.

(Wyatt Dep. 37:24-38:5.)

. . . .

Q:    So at some point did you and Rocco reach an agreement as to how you
        were going to invest into the band and how the band was going to cross-
        promote the racing boat venture?
A:    I think I had an agreement with Shark Salsa to use the band and promote
        the band and the race team where needed together, if not separately.
Q:    But the discussions that you had were primarily between Rocco, right, not
        any representative of Shark Salsa Latin Productions.

12

A:      I thought Shark Salsa was Rocco.

(Id. at 38:15-39:4.)

. . . .

Q:      I appreciate that, but that wasn't my question.  My question is notwithstanding the fact that you guys didn't sign an agreement that explicitly laid out your investment in the band and the band's cross-promotion of the racing venture, you guys still followed through with the, let's call it verbal agreement that you made to do those things; isn't that right?
[counsel's objection]
A:      As I said, we did complete the CD.

(Id. at 44:14 - 45:3.)

. . . .

Q:      Now, after you and Rocco entered into this arrangement did the band create songs for the racing boat team?
A:      Yes.

(Id. at 46:11-14.)

. . . .

Q:      Shortly after you made this arrangement with Rocco you did brand your boat with the name of the band, right?
A:      We put Cintron on the boat in addition to DF Young.

(Id. at 47:12- 16.)

Where the facts are in dispute, the question of whether a contract was formed is for the jury to decide.  StockTrans, Inc. v. Rostolder, No. 07-1339, 2007 WL 2317403, at * 3 (E.D. Pa. Aug. 7, 2007); Ingrassia Constr. Co., Inc. v. Walsh, 486 A.2d 478, 482 (Pa. Super. Ct. 1984). For all of the above reasons, there exists in this matter material facts which must be decided by the finder of fact as to whether DePersia and Wyatt entered into a verbal agreement(s) concerning

13

the ownership of Cintron.

> 2.      **Damages for Beach of Contract**

The Moving Parties next assert that summary judgment is appropriate because DePersia cannot establish damages to a reasonable certainty.  They contend that DePersia has provided no evidence which establishes the value of the ownership units that were supposed to be given to him by Wyatt.  To state a claim for breach of contract under Pennsylvania law, a plaintiff must allege three things: (1) the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract; and (3) resultant damages.  Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 502 (E.D. Pa. 2008); CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999).  Under Pennsylvania law, an injured party need only prove damages with reasonable certainty.  ATACS Corp. v. Trans World Commc'n, Inc., 155 F.3d 659, 669 -70 (3d Cir. 1998); See also Scobell, Inc. v. Schade, 688 A.2d 715, 719 (Pa. Super. Ct. 1997).  Doubts are construed against the breaching party.  Delahanty v. First Pa Bank, 464 A.2d 1243, 1257 (Pa. Super. Ct. 1983).

The Third Circuit in ATACS, stated that "'reasonable certainty,' as with most other standards of proof, is a difficult concept to quantify, but Pennsylvania courts have provided guidance as to what the term entails for purposes of assessing damages.  At a minimum, reasonable certainty embraces a rough calculation that is not 'too speculative, vague or contingent upon some unknown factor.'"  ATACS, 155 F.3d at 669; see Spang & Co. v. U.S. Steel Corp., 545 A.2d 861, 866 (Pa. 1988).  "Conversely, applying the reasonable certainty standard does not preclude an award of damages because of 'some uncertainty as to the precise amount of damages incurred.'"  ATACS, 155 F.3d at 670; see Pugh v. Holmes, 486 Pa. 272, 405

A.2d 897, 909 (Pa. 1979).  ATACS further stated that "Pennsylvania jurisprudence governing the issue is summarized in Aiken Indus., Inc. v. Estate of Wilson, 383 A.2d 808 (Pa. 1978), where the Pennsylvania Supreme Court ultimately concluded 'that compensation for breach of contract cannot be justly refused because proof of the exact amount of loss is not produced, for there is judicial recognition of the difficulty or even impossibility of the production of such proof. What the law does require in cases of this character is that the evidence shall with a fair degree of probability establish a basis for the assessment of damages.'" Id.

The Moving Parties argue that DePersia cannot establish his damages to a reasonable certainty since no profits would be paid under the purported agreement until Wyatt recouped his investment in Cintron, and Cintron has yet to make a profit.  Wyatt testified that, to date, he had invested $20 million in Cintron, and has not recovered any of this investment.  (Wyatt Dep. 9:15- 19, 231:24- 232:2.)  The Moving Parties also claim that DePersia cannot establish his damages to a reasonable certainty because he has produced no proof of his damages.

We, however, find that there is evidence in the record upon which a factfinder could base an award of damages, and such creates a genuine issue of material fact at this summary judgment stage.  As discussed above, DePersia maintains that he owns at least a 10% share in the ownership of Cintron.  Wyatt testified that he certainly expected a rate of return on his investment, but has not yet recouped any of the $20 million.  This, however, does not mean that Cintron would not make a profit in the future entitling DePersia to possibly 10% or more of such profits.  Wyatt testified that total sales for the company in 2007 were approximately $4 million. (Wyatt Dep. 229:15- 232:1.)  In addition, Joseph Roberts, President of Cintron, testified at his deposition concerning the growth and sales of the company.  He stated that, currently, the

15

company was selling 19 products (four fruit drinks, six green teas, three black teas, and six energy drinks), and distributed these products in thirty- eight states.  Roberts testified further that the company sold more than 200,000 cases of beverages in 2007, and projected to sell approximately 275,000 in 2008.  He also testified that there are company documents that reflect these numbers, but did not think they were given to Cintron's lawyer.  (Roberts Dep. 237:19-241:16.)  Furthermore, when asked what he thought the company was worth, Roberts responded that "I don't think about it.  We are still building."  (Roberts Dep. 245:19- 20.)  Accordingly, we find that this evidence is sufficient to establish a genuine issue of material fact as to damages.

**3.      DePersia's Failure to Name Cintron in his Third Party Complaint**

The Moving Parties lastly assert that DePersia claims that there was an agreement(s) reached between himself and Wyatt, yet Wyatt never appears as a party in any of the draft agreements prepared by DePersia.  The Moving Parties argue that this shows that DePersia's intention was to have a final agreement with Cintron, the corporation, and that DePersia's failure to name Cintron in his Third Party Complaint is fatal to his cause of action against Wyatt.

This argument, however, is flawed.  First, DePersia is not arguing that any of the draft agreements that he sent to Wyatt were final written agreements between himself and Wyatt.  As discussed above, the issue for the factfinder in this action is whether an oral contract was established between DePersia and Wyatt concerning the ownership of Cintron, not whether a particular agreement was the final contract.

Next, it is clear from the deposition testimony that DePersia always considered Wyatt as Cintron itself, just as Wyatt considered DePersia as Shark Salsa.  Wyatt cannot have the argument both ways.  In his deposition testimony regarding a verbal agreement between himself

16

and DePersia concerning his use of the Cintron name for his racing boat, Wyatt was asked:

Q:      So at some point did you and Rocco reach an agreement as to how you
        were going to invest into the band and how the band was going to cross-
        promote the racing boat venture?

A:      I think I had an agreement with Shark Salsa to use the band and promote
        the band and the race team where needed together, if not separately.

Q:      But the discussions that you had were primarily between Rocco, right, not
        any representative of Shark Salsa Latin Productions.

A:      I thought Shark Salsa was Rocco.

(Wyatt Dep. 38:15-39:4.)

        For all of the above reasons, the Moving Parties' Motion for Summary Judgment is

denied.  An appropriate Order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

|  |  |  |
|---|---|---|
| CINTRON BEVERAGE GROUP, LLC, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. 07-3043 |
| | : | |
| ROCCO DEPERSIA, | : | |
| | : | |
| Defendant/ Third Party Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| A. WESLEY WYATT | : | |
| | : | |
| Third Party Defendant. | : | |

---

## ORDER

**AND NOW**, this   1st   day of  April, 2009, upon consideration of Plaintiff, Cintron

Beverage Group, and Third Party Defendant, A. Wesley Wyatt's, joint Motion for Summary

Judgment (Doc. No. 31), Defendant/Third Party Plaintiff, Rocco DePersia's, Response, and the

Reply to this Response, it is hereby **ORDERED** that said Motion is **DENIED.**


BY THE COURT:


 /s/ Robert F. Kelly
ROBERT F. KELLY
SENIOR JUDGE